O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MYESHA LOPEZ, ET AL.,

                 Plaintiff,

     v.

COUNTY OF LOS ANGELES, ET AL.,

                 Defendants.

Case No.: 5:21-cv-00290-MEMF-SHK

**ORDER GRANTING IN PART PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE [ECF NO. 171], GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF NO. 170], AND DENYING PLAINTIFFS' MOTION FOR SANCTIONS [ECF NO. 163]**

KIMBERLY SMITH,

                Plaintiff,

     v.

COUNTY OF LOS ANGELES, ET AL.,

                 Defendants.

Before the Court is a Motion for Summary Judgment, or Summary Adjudication filed by Defendants County of Los Angeles, *et al.* (ECF No. 170-1). Also before the Court is a Joint Request for Judicial Notice (ECF No. 171) and Motion for Termination and Other Sanctions (ECF No. 163) filed by Plaintiffs Myesha Lopez, Alesha Garrett, Nikki Lee, Twana Thomas, Tatiana Thomas, Prechious Lee, and Kimberly Smith. For the reasons stated herein, the Court GRANTS IN PART the Joint Request for Judicial Notice filed by Plaintiffs, GRANTS IN PART the Motion for Summary Judgment filed by Defendants, and DENIES the Motion for Termination and Other Sanctions filed by Plaintiffs.

/ / /

## I.    **Factual and Procedural Background**

This case arises from the death of Michael L. Thomas. On June 11, 2020, Thomas was fatally shot during an encounter with five Los Angeles Sheriff's Department Sheriff's Deputies at the residence of his life partner, Plaintiff Kimberly Smith, located in Lancaster, California. ECF No. 170-3 ¶ 88. Plaintiffs Myesha Lopez, Alesha Garrett, Nikki Lee, Twana Thomas, Tatiana Thomas, and Prechious Lee are Thomas's daughters and successors-in-interest.[1]

On February 19, 2021, the Thomas Children filed suit regarding the circumstances of Thomas's death. ECF No. 1. After subsequent motion practice, on March 15, 2023, the Thomas Children filed a Fifth Amended Complaint ("5AC"). ECF No. 78.

On March 25, 2022, Smith filed suit regarding the same incident in which Thomas died. *Kimberly Smith v. County of Los Angeles et al.*, Case No. 2:22-cv-01977-MEMF-SHK, ECF No. 1 (C.D. Cal. Mar. 25, 2022). On December 6, 2022, the Court consolidated Smith's lawsuit with the Thomas Children's lawsuit. ECF No. 73. Smith filed her Second Amended Complaint ("2AC") on September 21, 2023. ECF No. 96.

Defendants in this action are the County of Los Angeles and Sheriff's Deputies Ty Shelton, Ruben Perales, Louie Herrera, Kyle Murphy, and Miguel Gonzalez. *See generally* 2AC, 5AC.

The Thomas Children bring the following causes of action in their Fifth Amended Complaint:

---

[1] Thomas Michael L. Thomas will be referred to as "Thomas." His daughters Twana Thomas and Tatiana Thomas will be referred to by their full names. Plaintiffs Myesha Lopez, Alesha Garrett, Nikki Lee, Twana Thomas, Tatiana Thomas, and Prechious Lee will be collectively referred to as the "Thomas Children." Plaintiff Kimberly Smith will be referred to as "Smith." The Thomas Children and Smith will be collectively referred to as the "Plaintiffs." The Los Angeles Sheriff's Department will be referred to as LASD. Defendant County of Los Angeles will be referred to as "COLA" and Defendant Sheriff's Deputies Ty Shelton, Ruben Perales, Louie Herrera, Kyle Murphy, and Miguel Gonzalez will be referred to as "Shelton," "Perales," "Herrera," "Murphy," and "Gonzalez," respectively. All defendants will be referred to collectively as the "Defendants".

| Cause of Action | Plaintiffs | Defendants |
|---|---|---|
| 1. Unlawful Entry into Home, in violation of the Fourth Amendment to the United States Constitution (42 U.S.C. § 1983) | Thomas Children, as successors-in-interest of Thomas | Ty Shelton, Ruben Perales, Louie Herrera, Kyle Murphy, Miguel Gonzalez<br><br>(collectively, "Defendant Deputies") |
| 2. Excessive Force, in violation of the Fourth and Fourteenth Amendment to the United States Constitution (42 U.S.C. § 1983) | Thomas Children, as successors-in-interest of Thomas | Defendant Deputies |
| 3. Denial of Medical Care (42 U.S.C. § 1983) | Thomas Children, as successors-in-interest of Thomas | Defendant Deputies |
| 4. Interference with Familial Relationship and Freedom of Association, in violation of the Due Process Clause of the Fourteenth Amendment (42 U.S.C. § 1983) | Thomas Children on their own behalf. | Defendant Deputies |
| 5. Custom, Practice or Policy Causing Violation of Civil Rights, in violation of the Fourth and Fourteenth Amendments to the United States Constitution (*Monell* – 42 U.S.C. § 1983) | Thomas Children, as successors-in-interest of Thomas | COLA<br><br>("County Defendant) |
| 6. Battery – Wrongful Death (Cal. Govt. Code §§ 812(a) and 820(a)) | Thomas Children, as successors-in-interest of Thomas | Defendants |
| 7. Negligence – Wrongful Death (Cal. Govt. Code §§ 812(a) and 820(a)) | Thomas Children, as successors-in-interest of Thomas | Defendants |
| 8. Violation of the Tom Bane Act (Cal. Civil Code §§ 52 and 52.1; Cal Govt. Code §§ 812(a) and 820(a))) | Thomas Children, as successors-in-interest of Thomas | Defendants |

*See generally* 5AC.

Smith brings the following causes of action in in her Second Amended Complaint:

| Cause of Action | Plaintiffs | Defendants |
|---|---|---|
| 1. Unlawful Entry into Home, in violation of the Fourth Amendment to the United States Constitution (42 U.S.C. § 1983) | Smith | Defendant Deputies |
| 2. Unlawful Arrest, in violation of the Fourth and Fourteenth | Smith | Defendant Deputies |

| | | |
|---|---|---|
| Amendments to the United States Constitution (42 U.S.C. § 1983) | | |
| 3. Excessive Force, in violation of the Fourth and Fourteenth Amendments to the United States Constitution (42 U.S.C. § 1983) | Smith | Defendant Deputies |
| 4. Custom, Practice or Policy Causing Violation of Civil Rights, in violation of the Fourth and Fourteenth Amendments to the United States Constitution (*Monell* – 42 U.S.C. § 1983) | Smith | County Defendant |

*See generally* 2AC.

On April 17, 2025, Plaintiffs filed a Motion for Termination and Other Sanctions ("Motion for Sanctions"). ECF No. 163. The Motion is fully briefed. *See* ECF No. 150; ECF No. 152; ECF No. 153.

On April 17, 2025, Defendants filed a motion for summary judgment, or summary adjudication. ECF No. 164-1. On May 22, 2025, Defendants filed the instant, fully integrated Motion for Summary Judgment, or Summary Adjudication, which includes amended replies to Plaintiffs' opposition arguments. ECF No. 170-1 ("Motion" or "Mot."). Defendants also filed evidentiary objections. ECF No.170-4 ("Evidentiary Objections").

Plaintiffs did not file separate evidentiary objections or otherwise respond to Defendants' Evidentiary Objections. Plaintiffs filed a Joint Request for Judicial Notice on May 22, 2025. ECF No. 171 ("RJN"). Defendants filed an Opposition to the RJN on May 22, 2025. ECF No. 172.[2]

On August 21, 2025, the Court held a hearing on the Motion.

---

[2] The Court notes that both Plaintiffs' and Defendants' respective arguments in the Motion run well past the twenty-five page limit imposed on the parties by this Court's operative Civil Standing Order. The Civil Standing Order instructs that "[i]f a party believes … good cause exists . . . to increase page limits, the party shall seek leave by noticed motion setting forth a detailed showing of good cause." *Id.* Neither party, however, sought leave from the Court to exceed the limit. The Court in its discretion will consider the full briefing, but future filings may be stricken if not filed in full compliance with the Court's Standing Order.

## II.    **Plaintiffs' Request for Judicial Notice**

A court may judicially notice facts that: "(1) [are] generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b). Under this standard, courts may judicially notice "undisputed matters of public record," but generally may not notice "disputed facts stated in public records." *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1125–26 (9th Cir. 2002).

In support of their opposition to the Motion, Plaintiffs request that the Court judicially notice the following records:

1. U.S. Department of Justice Civil Rights Division Findings Letter to Sheriff Leroy D. Baca dated June 28, 2013, ECF No. 170-53, Ex. 74;
2. *U.S. v. Cnty. of Los Angeles et. al*, Case No, 2:15-cv-03174-DDP-JEM [ECF No. 4] ("settlement agreement"), ECF No. 170-54, Ex. 75;
3. *U.S. v. Cnty. of Los Angeles et. al*, Case No, 2:15-cv-03174-DDP-JEM [ECF No. 81] (Monitor Team's First Report), ECF No. 170-55, Ex. 76;
4. Antelope Valley Monitoring Team's 10th Semi-Annual Report, National Council on Crime & Delinquency, June 2020 (Monitor Team's Tenth Report), ECF No. 170-56, Ex. 77;
5. Los Angeles County Sheriff's Department First Quarter 2023 Discipline Report, ECF No. 170-57, Ex. 78;
6. Report on Citizens' Commission on Jail Violence, September 2012, ECF No. 170-59, Ex. 80; and
7. Analysis of the Criminal Investigation of Alleged Assault by Banditos, ECF No. 170-60, Ex. 81.

*See* RJN.

The Court takes judicial notice of the settlement agreement, the Monitor Team's First Report, and the Monitoring Team's Tenth Report as those records constitute court filings and other matters of public record that are verifiable. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741 n.6 (9th Cir. 2006) (explaining that it is appropriate to take judicial notice of court filings and other matter of public record, such as filings in other litigation as they are readily verifiable). Those exhibits are frequently referenced in Plaintiffs' respective *Monell* claims and are public records such that their existence and contents (i.e., the fact that these documents exist and that they contain the words they contain) cannot reasonably be disputed. Thus, they are properly subject to judicial notice.

*See* Fed. R. Evid. 201(b)(2). The Court will take judicial notice of these documents, but not of any disputed facts contained therein.[3]

Defendants do not contest Plaintiffs' RJN as it pertains to LASD's Department First Quarter 2023 Discipline Report. The Court takes judicial notice of this record since it is an undisputed matter of public record within the meaning of Federal Rule of Evidence 201.

The Court declines to take judicial notice of the remaining records as they are unnecessary for the disposition of the Motion.

**III.    Applicable Law**

**A. Motions for Summary Judgment**

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. A court must view the facts and draw inferences in the manner most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). "A moving party without the ultimate burden of persuasion at trial—usually, but not always, a defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To carry its burden of production, the moving party must either: (1) produce evidence negating an essential element of the nonmoving party's claim or defense; or (2) show that there is an absence of evidence to support the nonmoving party's case. *Id.*

Where a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial. *Id.* at 1102–03. In such cases, the nonmoving party may defeat the motion for

---

[3] Defendants' opposition to the RJN acknowledges that the existence of these records may be judicially noticed. *See* ECF No. 172 at 3.

summary judgment without producing anything. *Id.* at 1103. However, if a moving party carries its burden of production, the burden shifts to the nonmoving party to produce evidence showing a genuine dispute of material fact for trial. *Anderson*, 477 U.S. at 248–49. Under these circumstances, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted). If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the motion for summary judgment shall be granted. *Id.* at 322 ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *See id.* "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed." Fed. R. Civ. P. 56(e)(2). The Court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. *Id.* 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Anderson*, 477 U.S. at 252.

To carry its ultimate burden of persuasion on the motion, the moving party must demonstrate that there is no genuine issue of material fact for trial. *Nissan Fire*, 210 F.3d at 1102; *Celotex Corp.*, 477 U.S. at 323.

**B.  28 U.S.C. § 1983**

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of

the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 28 U.S.C. § 1983 ("Section 1983").

## IV.    Findings of Fact[4, 5]

The Court finds the following material facts are established for trial under Federal Rules of Civil Procedure 56(a) and 56(g).

### A.    Defendant Deputies' Fatal Encounter with Thomas and Smith on June 11, 2020

On June 11, 2020, LASD received a phone call in which audible yelling from both Thomas and Smith could be heard in the background. SUF ¶ 1. The dispatch operator made multiple attempts to communicate with the caller throughout the call but received no response. *Id*. ¶ 2. During the call, a woman's voice could be heard yelling "you hit me," "you tried to stab me," and "you put your hands on me." *Id.* ¶¶ 1, 4. Defendant Deputies received an emergent call for service through their patrol cars' mobile digital computers ("MDC") which stated that there was "yelling in [the] background" and that the dispatcher heard an individuals state "Don't hit me." *Id*. ¶ 5. They were also informed by the dispatch operator via radio dispatch that the 911 call involved a man and women arguing with one another and a possible domestic altercation. ¶¶ 7–12.

---

[4] The facts set forth below are taken from the parties' Statement of Uncontroverted Facts. ECF No. 170-3 ("SUF"). To the extent that any statements of fact are omitted, the Court concludes they are not material to the disposition of this Motion. To the extent that any of the facts set below were allegedly disputed, the Court concludes that no actual dispute exists or that the adopted language resolves the dispute.

[5] In making these Findings of Facts, the Court considered Defendants' Evidentiary Objections. ECF No. 170-4 ("Objections"). Moving Defendants' objections are boilerplate objections based on lack of foundation, hearsay, and relevance that are duplicative of the summary judgment standard itself. *See Sandoval v. Cnty. of San Diego*, 985 F.3d 657,665 (9th Cir. 2021). Furthermore, the Ninth Circuit has recognized that "a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56." *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir.2003) (quoting *Block v. City of L.A.*, 253 F.3d 410, 418–19 (9th Cir. 2001) (emphasis added)). In other words, when evidence is not presented in admissible form at summary judgment but could be later presented in an admissible form at trial, a court may still consider the evidence for the purposes of summary judgment. *Id.* at 1037; *see also Celotex Corp.*, 477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."). For these reasons, to the extent the Court relies upon evidence to which the parties object, the objections are OVERRULED.

Herrera and Perales were the first to arrive at residence. *Id.* ¶¶ 14, 16. They both heard an intense argument transpiring between a man and a woman inside the home. *Id.* ¶¶ 14, 16. The other Defendant Deputies arrived shortly thereafter, and also heard arguing and shouting emanating from inside the residence. *Id.* ¶¶ 18–22. Defendant Deputies knocked on the door, and Thomas responded shortly thereafter by opening the home's interior door but leaving the exterior security door closed. *Id.* ¶ 23. Defendant Deputies instructed Thomas to open the security door, which he refused. *Id.* ¶¶ 24. Thomas appeared agitated throughout his encounter with Defendant Deputies. *Id.* ¶¶ 25–29. Several Defendant Deputies either observed Smith directly or heard her behind Thomas in a distressed state. *Id.* ¶ 27–29. After several back-and-forth exchanges wherein Thomas denied Defendant Deputies' repeated requests to open the exterior door, Shelton forcibly opened the door and Defendant Deputies entered the residence. *Id.* ¶¶ 30–31. Defendant Deputies approached Thomas, commanded that he stop resisting and grabbed him by the arms wrists to gain compliance. *Id.* ¶¶ 32–37. Thomas initially struggled against Defendant Deputies' attempts to physically restrain him. *Id.* ¶¶ 34, 37–38. While several Defendant Deputies were detaining Thomas, Shelton drew his service firearm and fired one round at Thomas from close range. *Id.* ¶¶ 41–42, 44. Upon being shot, Thomas fell on a nearby couch and slid down onto to the floor. *Id.* ¶ 44. Immediately following the shooting, Defendant Deputies stepped outside of the residence to verify no officer had been injured and to issue a radio call to summon medical attention. *Id.* ¶¶ 46–47. Defendant Deputies than reentered the home, conducted a security sweep and evacuated Smith out of the residence. *Id.* ¶ 53. Soon after, additional Sherriff's Deputies arrived on scene and attempted to perform life saving measures on Thomas. *Id.* ¶ 49. He was later transported to the Antelope Valley Hospital, where he was pronounced dead. *Id.* ¶ 50.

**B. Relevant LASD Policies**

As LASD Sheriff's Deputies, Defendant Deputies professional responsibilities and conduct were governed by LASD's policies and directives, including the Department's policies and directives governing domestic violence incidents and warrantless entries. *Id.* ¶¶ 64–66. LASD's policy concerning warrantless entries requires that deputies enter a dwelling without a warrant only when exigent circumstances exist. *Id.* ¶¶ 67–68. LASD also maintains a policy regarding use of

force. *Id.* ¶ 70. The use of force policy permits use of deadly force only where it is objectively reasonable to do so. *Id.* ¶ 71.[6] The policy clarifies that it is objectively reasonable to use deadly force only when a suspect poses an objectively reasonable imminent threat of death or serious bodily harm to a Sheriff's Deputy or a third party. *Id.* ¶¶ 73, 75. Furthermore, LASD policy requires that Sheriff's Deputies seek to de-escalate confrontation through other measures in order to mitigate incidents of use of force incidents. *Id.* ¶ 74.

In addition, pursuant to LASD policy, Sheriff's Deputies are required to summon medical assistance for any individual injured during a use of force incident. *Id.* ¶ 76.

## V.  Discussion

### A.  The Defendants are Entitled to Summary Judgment in their Favor as to the Thomas Children's Claim for Unlawful Entry into Home (First Cause of Action) and Smith's Claim for Unlawful Entry into Home (First Cause of Action) Because There Is No Material Dispute of Fact as to Those Claims.

The Thomas Children (as successors-in-interest of their father) and Smith (on her own behalf) bring claims against Defendant Deputies for Unlawful Entry into Home under Section 1983. *See* 2AC ¶¶ 43–53; 5AC ¶¶ 29–36. The parties dispute whether exigent circumstances existed such that Defendant Deputies were justified in entering the residence without a warrant.

The Fourth Amendment generally "prohibits law enforcement from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." *Payton v. New York*, 445 U.S. 573, 576 (1980). "[F]or the purposes of § 1983, a properly issued warrant makes an officer's otherwise unreasonable entry non-tortious—that is, not a trespass. Absent a warrant or consent or exigent circumstances, an officer must not enter; it is the entry that constitutes the breach of duty under the Fourth Amendment." *Mendez v. Cnty. of Los Angeles*, 897 F.3d 1067, 1076 (9th Cir. 2018). An exception exists to the warrant requirement when officers have probable cause to believe a crime has been committed and exigent circumstances exist. *U.S. v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005). As a general rule, exigent circumstances are defined as, "[c]ircumstances

---

[6] "Deadly force" is defined as "force that creates a substantial risk of causing death or serious bodily injury." *City of Hemet*, 394 F.3d 689, 693 (9th Cir. 2005).

that would cause a reasonable person to believe that entry … was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *United States v. Brooks*, 367 F.3d 1128 (9th Cir. 2004) (internal quotation marks and citations omitted). The government bears the burden of demonstrating specific and articulable facts to justify the finding of exigent circumstances. *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 957 (9th Cir. 2000) (internal quotation marks and citations omitted). The Ninth Circuit has explained that "the exigencies of domestic abuse cases present dangers that, in an appropriate case, may override considerations of privacy." *Brooks*, 367 F.3d at 1136. "Courts have recognized the combustible nature of domestic disputes, and have accorded great latitude to an officer's belief that warrantless entry was justified by exigent circumstances when the officer had substantial reason to believe that one of the parties to the dispute was in danger." *Id.* (quoting *Tierney v. Davidson*, 133 F.3d 189, 197 (2d Cir. 1998)).

Here, the Court finds that Defendants have established that there is no genuine dispute of material fact as to whether there was an objectively reasonable exigency or emergency (like a threat to Smith) that would lead a reasonable officer to enter the residence without a warrant. The Plaintiffs do not dispute the following facts, which the Court finds give rise to a reasonable belief on the part of the Defendant Deputies that emergent circumstances called for a warrantless entry: LASD received an emergency call that included clear indications of domestic violence, including statements such as you tried to stab me," and "you put your hands on me." Mot. at 25–27, 33; SUF ¶ 5; *see also* ECF No. 170-7, Ex. 26. This information was relayed to Defendant Deputies through their MDCs—specifically, the "yelling" in the background and the words "Don't hit me." SUF ¶ 5, ECF No. 170-10, Ex. 28. Moreover, the 911 dispatch operator informed Perales, Gonzales, Shelton, and Murphy that the emergent call involved possible domestic violence. *Id.* ¶¶ 7, 9, 11–12. Upon arriving at the residence, Herrera and Perales heard an intense argument inside. *Id.* ¶ 14. Shelton, Gonzales, and Murphy arrived shortly thereafter and similarly heard yelling emanating from the residence. *Id.* ¶¶ 19–21. After Defendant Deputies knocked on the door, Thomas opened the interior door but refused to open the exterior door and refused to allow Defendant Deputies inside. *Id.* ¶ 23,

25–26; *see also* ECF No. 170-7, Ex. 26. At this point, Thomas was clearly agitated, and Defendant Deputies observed Smith in a distressed state.[7] *Id.* ¶¶ 25, 27, ECF No. 170-7, Ex. 26.

In light of the combustible nature of domestic violence, the Court finds that the circumstances that Defendant Deputies encountered presented an objectively reasonable basis for their belief that exigent circumstances justified a warrantless entry to ensure Smith's wellbeing, to prevent future violence, and to investigate whether any act of domestic violence transpired.[8] *Martinez*, 406 F.3d at 1164 ("When the domestic violence victim is still in the home, circumstances may justify an entry pursuant to the exigency doctrine."); *United States v. Brown*, 64 F.3d 1083, 1086 (7th Cir. 1995) ("We do not think that the police must stand outside an apartment, despite legitimate concerns about the welfare of the occupant, unless they can hear screams.").

As such, the Court finds there is no genuine dispute of material fact as to the Thomas Children's first Cause of Action for Unlawful Entry into Home or as to Smith's first Cause of Action for Unlawful Entry into Home. The Court GRANTS the Motion as to these claims, and they are therefore DISMISSED.

**B. A Material Dispute of Fact Exists as to the Thomas Children's Excessive Force Claim (Second Cause of Action).**

The Thomas Children bring a claim against Defendant Deputies for Excessive Force under Section 1983. *See* 5AC ¶¶ 37–43.

The Fourth Amendment governs claims concerning a law enforcement officer's excessive use of force, whether those claims are brought under federal or state law. *Graham v. Conner*, 490 U.S. 386, 395–96 (1989); *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1102 (2004) (analyzing a state law claim for battery by excessive force under the reasonableness standard of the

---

[7] Defendants also assert—and Plaintiffs dispute, by way of Smith's testimony—that Thomas physically blocked Smith from opening the exterior door herself. Compare ECF No. 170-11 at 66:10–16; ECF No. 170-13 at 65:18–25; and ECF No. 170-15 at 50:8–25; 51:1–5 with ECF No. 170-50 ¶ 4 (Smith's declaration stating that she neither tried to speak to Defendant Deputies nor attempted to open the exterior door while they were outside).

[8] At the hearing, Plaintiffs argue that the Court should limit its consideration to what the Defendant Deputies knew as they approached the residence—which would not include everything on the 911 calls—and that is precisely what the Court has done. The MDC transmission advised the officers of the yelling and the "Don't hit me."

Fourth Amendment). Moreover, the Fourth Amendment's prohibition against unreasonable searches and seizures permits law enforcement officers to use only the level of force that is "objectively reasonable" under the particular circumstances to effect an arrest. *Graham*, 490 U.S. at 397. Whether the force used in a particular instance is objectively reasonable requires a "careful balancing of the 'nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (citation omitted).

The severity of an intrusion on an individual's Fourth Amendment interests is evaluated by analyzing the type and amount of force inflicted during the incident. *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003). The importance of the government interests at stake is evaluated by considering: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect actively resists detention or attempts to escape. *Chew v. Gates*, 27 F.3d 1432, 1440–41 (9th Cir. 1994). In addition, the Court must evaluate "the force that was used by the officers against the need for such force to determine whether the force used was greater than is reasonable under the circumstances." *Espinosa v. City & Cnty. of S. F.*, 598 F.3d 528, 537 (9th Cir. 2010). In officer-involved shootings, "because the person most likely to rebut the officers' version of events—the one killed—can't testify, '[t]he judge must carefully examine all evidence in the record … to determine whether the officer's story is internally consistent with other known facts.'" *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).

Here, under the Fourth Amendment, the "nature and quality of the intrusion" was undisputedly intrusive as Shelton used lethal force when he fired one round at Thomas, causing his death. SUF ¶ 42; *Tennessee v. Garner*, 471 U.S. 1, 9 (1985) ("The intrusiveness of a seizure by means of deadly force is unmatched"); *A. K. H by & through Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) ("The use of deadly force implicates the highest level of Fourth Amendment interests both because a suspect has a 'fundamental interest in his own life' and because such force 'frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment.'") (quoting *Garner*, 471 U.S. at 9). Because no one disputes that Defendant Deputies employed the highest level of force against Thomas the issue is determining whether the

governmental interests at stake were sufficient to justify it. The Court considers the three government interest factors in turn.

> 1. *There Is a Genuine Dispute of Fact Regarding the Severity of the Crime (First Factor).*

Under the first factor—severity of the crime—the Court considers the severity of the crime at issue. The Court finds that there is a genuine dispute of fact with respect to this factor. On one hand, the Defendant Deputies produce evidence tending to show that Shelton felt compelled to fire his service weapon when Thomas was not complying with Defendant Deputies' orders and was resisting arrest. Mot. at 44–45; SUF ¶¶ 32–35. On the other hand, Smith's sworn statement materially contradicts Shelton's rationale for using force since she stated that when Thomas was shot, he was not reaching for any of the Defendant Deputies' service firearms but rather had both of his hands behind his back. ECF No. 170-50 ¶ 9. The Plaintiffs have therefore created a genuine dispute of material fact regarding what Thomas was doing when he was shot and therefore whether the severity of the crime in this instance was sufficient to justify the use of deadly force.[9] *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007) (finding obstructing a police officer was not a "serious offense" for the purposes of the Fourth Amendment objective reasonableness standard).[10]

> 2. *There is a Genuine Dispute of Fact Regarding the Immediate Threat to Safety (Second Factor).*

---

[9] As discussed below, the Court finds it undisputed that Thomas initially resisted Defendant Deputies attempts to arrest him. The question, however, is whether Thomas was still resisting arrest when he was shot and whether he posed an immediate threat to the safety of Defendant Deputies or Smith.

[10] During the August 21, 2025 hearing on the Motion, Defendants' Counsel argued that under *Barnes v. Felix*, 145 S. Ct. 1353, 1358 (2025), the totality of the circumstances that Defendant Deputies confronted during their encounter with Thomas and in the moments leading up to their arrival at the residence renders the use - of-force at issue here reasonable. In particular, Defendants' Counsel contended that Defendant Deputies' awareness of a potential domestic incident at the residency combined with their observation of Smith in distress and being physically pushed back by Thomas when she tried to reach for the exterior door led Defendant Deputies to reasonably believe that a severe crime had taken place and that Thomas presented a threat to their safety and to Smith's safety. Furthermore, Defendants' Counsel compared the circumstances that Defendant Deputies confronted here to the circumstances officers confronted in *Waid v. Cnty. of Lyon*, 87 F.4th 383, 389 (9th Cir. 2023), where the Ninth Circuit noted that it was not obvious that officers were constitutionally precluded from using lethal force where the victim was unarmed and not reaching for a weapon but used aggressive language with the officers and rushed towards them in a confined space. The Court notes, however, that in arguing these points, Defendants' Counsel relied on *disputed* facts.

14

The "most important" government interest at stake is "whether the suspect posed an immediate threat to the safety of the officers or others.'" *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (quoting *Smith*, 394 F.3d at 702. Deadly force is permissible only "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm." *Garner*, 471 U.S. at 11.

Defendants argue that the shooting of Thomas was objectively reasonable because Thomas was on the verge of gaining control of Perales' service firearm. However, Plaintiffs have successfully shown that there is a factual dispute as to whether Thomas grabbed or even attempted to grab Perales' gun. Smith's declaration directly refutes Shelton's assertion that he was compelled to shoot when he saw Thomas gripping Perales' service firearm. ECF No. 170-11 at 59–60. As previously stated, Smith claimed that Thomas was shot while he had both of his hands behind his back. ECF No. 170-50 ¶ 9. Equally significant, Smith stated that Thomas never touched or reached out for any of the Defendant Deputies' service firearms or holsters. ECF No. 170-50 ¶ 9.

The Court also notes that there is no dispute that Defendant Deputies significantly outnumbered Thomas, further undermining the notion that Thomas posed a grave threat to Defendant Deputies' safety and the level of force used was reasonable. *See Hopkins v. Bonvicino*, 573 F.3d 752, 776–77 (9th Cir. 2009) (affirming denial of summary judgment on excessive force claim where suspect was not a safety threat, did not have a gun, and the officers outnumbered him).

Aside from Shelton's testimony, Defendants produce no other evidence suggesting that Thomas was armed with any weapon or that Defendant Deputies could have reasonably suspected him of being armed such that he presented an immediate threat. *See George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) ("If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat."). And the record indicates Shelton's own testimony concerning this issue appears internally inconsistent. In particular, Shelton initially claimed that he was standing in the doorway during the shooting but also described having both hands on Thomas's arms just before drawing his service weapon. SUF ¶¶ 197, 205. Shelton further stated that he observed Thomas grab Perales' service firearm with his right hand, but later he asserted that Thomas's forearm blocked his view of Perales' firearm holster. *Id.* ¶¶

1    195, 196. Moreover, in several post-incident interviews, Shelton claimed that he called out to Perales

2    "he has your gun" during the encounter. ECF Nos. 65, 66. Defendants claim that when Perales heard

3    Shelton's warning, he looked down and saw Thomas's hand over his service firearm. Mot at 9–10.

4    The audio recording calls this assertion into question as it does not appear that Shelton ever shouted

5    such a warning once, much less five times, before fatally shooting Thomas, as he claims in the post-

6    incident interviews. ECF No. 170-7, Ex. 26; ECF No. 65.[11]

7        Accordingly, the Court finds that a genuine dispute of material fact exists as to whether the

8    immediate threat Thomas posed to Defendant Deputies and Smith justified the level of force used.

9            *3.   There Is a Genuine Dispute of Fact Regarding the Actively Resists Detention or*
10                 *Attempts to Escape Factor (Third Factor).*

11        Plaintiffs do not contest that Thomas initially resisted Defendant Deputies' attempts to detain

12    him; rather, they contest the notion that Thomas required restraint in the first place. SUF ¶¶ 33–40. '

13        However, Plaintiffs produce evidence tending to show that Thomas had his hands behind his

14    back at the time he was shot, indicating that he was subdued. ECF No. 170-50 ¶ 9. In addition, there

15    is no evidence before the Court that Thomas attempted to run from Defendant Deputies. Overall, the

16    Court finds that the evidence produced by the parties indicates that Thomas's resistance was not

17    particularly aggressive or that he showed any signs of fleeing the area to evade arrest. This is

18    especially in true in light of the fact that Thomas was significantly outnumbered by Defendant

19    Deputies five to one in a confined space. *Smith*, 394 F.3d at 703 (suspect's refusal to obey

20    commands and brief period of physical resistance were not "particularly bellicose" because suspect

21    did not try to flee or physically attack officers).

22        Moreover, even if Thomas was actively resisting arrest during the moment he was shot, that

23    factor alone does not justify the use of deadly force if Thomas did not pose an immediate threat of

24    death or serious physical injury to Defendant Deputies or to Smith. *Tennessee v. Garner*, 471 U.S. 1,

25

26

27

28

---

[11] The Court notes that even if Thomas had his hand on Perales' service firearm, that conduct does not automatically render Defendant Deputies' use of deadly force reasonable under the Fourth Amendment. *See Curnow v. Ridgecrest Police*, 952 F.2d 321, 323, 325 (9th Cir. 1991) (holding that deadly force was unreasonable where, according to the plaintiff's version of facts, the decedent possessed a gun but was not pointing it at the officers and was not facing the officers when they shot him).

1    11 (1985) ("Where the suspect poses no immediate threat to the officer and no threat to others, the

2    harm resulting from failing to apprehend him does not justify deadly force to do so.").

3        Here, a jury could find that any resistance by Thomas "was not particularly bellicose" and

4    was insufficient to justify the amount of forced used against him. As such, the Court finds that a

5    genuine dispute of material fact exists as to whether the level of resistance Thomas engaged in

6    during his fatal encounter with Defendant Deputies justified the use of deadly force under the Fourth

7    Amendment.[12]

8        Therefore, the Motion as to the Thomas Children's second Cause of Action for Excessive

9    Force is DENIED.[13]

10   **C. A Material Dispute of Fact Exists as to the Thomas Children's State Law Battery (Sixth**
11   **Cause of Action) and Negligence Claims (Seventh Cause of Action).**

12       "Except when otherwise provided by law, public employees in California are statutorily

13   liable to the same extent as private persons for injuries caused by their acts or omissions, subject to

14   the same defenses available to private persons." *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 628–

15   29 (2013) (citing Cal. Gov't Code § 820). "[T]o prove facts sufficient to support a finding of

16   negligence, a plaintiff must show that defendant had a duty to use due care, that he breached that

17   duty, and that the breach was the proximate or legal cause of the resulting injury." *Id.* at 629.

18       In California, it is well established that "peace officers have a duty to act reasonably when

19   using deadly force." *Id.* "Law enforcement personnel's tactical conduct and decisions preceding the

20   use of deadly force are relevant considerations under California law in determining whether the use

21   of deadly force gives rice to negligence liability." *Id.* at 640. "Such liability can arise, for example, if

22   the tactical conduct and decisions show, as part of the totality of circumstances, that the use of

23   deadly force was unreasonable." *Id.*

24

---

25   [12] During the August 21, 2025 hearing on the Motion, Defendants' Counsel asserted Murphy and Gonzalez
26   did not use force against Thomas; however, this contention is disputed by Plaintiffs' Counsel, who assert that
     Murphy and Gonzalez were among the officers who grabbed Thomas and twisted his arms behind his back.

27   [13] The Court notes that Lopez's Excessive Force claim alleges two other separate bases of liability: (1)
     Defendant Deputies placing Thomas in a chokehold, and (2) Defendant Deputies twisting Thomas's arm
28   behind his back. *See* 5AC ¶ 38. Defendants do not challenge either of these theories of liability, and thus the
     Court will not address them.

"A state law battery claim is a counterpart to a federal claim of excessive use of force. In both, a plaintiff must prove that the peace officer's use of force was unreasonable." *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 527 (2009).

The Court has already determined that triable issues of fact exist as to the reasonableness of the use of deadly force against Thomas. Therefore, the Court also denies summary judgement as to the Thomas Children's state law claims for Battery and Negligence against all Defendants. *Nelson v. City of Davis*, 709 F. Supp. 2d 978, 992 (E.D. Cal. 2010), aff'd, 685 F.3d 867 (9th Cir. 2012) ("Because the same standards apply to both state law assault and battery and Section 1983 claims premised on constitutionally prohibited excessive force, the fact that Plaintiff's 1983 claims under the Fourth Amendment survive summary judgment also mandate that the assault and battery claims similarly survive."). Accordingly, the Motion as to the Thomas Children's sixth Cause of Action for Battery and seventh Cause of Action for Negligence is DENIED.

### D. A Material Dispute of Fact Prevents Summary Judgment On the Ground of Qualified Immunity With Respect to the Thomas Children's Excessive Force Claim (Second Cause of Action).

Defendants also move for summary judgment on the Thomas Children's Excessive Force Cause of Action based on the doctrine of qualified immunity. Mot. at 45–47.

Qualified immunity shields government officials, such as police offers, "from liability for civil damages [under Section 1983] insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Butz v. Economou*, 438 U.S. 478, 507 (1978).

In resolving a claim of qualified immunity, courts are required to undertake a two-step inquiry that considers (1) whether, taken in the light most favorable to the plaintiff, the defendant's conduct violated a constitutional right; and if so, (2) whether that right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Courts have the discretion to address the two-step inquiry in the order they deem most suitable under the circumstances and may address directly whether the

1  right at issue was clearly established rather than first determining whether an actual constitutional

2  violation occurred. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The analysis must assume

3  facts in the light most favorable to the injured party. *Katz*, 533 U.S. at 201. Thus, taken altogether,

4  defendants are "only entitled to qualified immunity as a matter of law if, taking the light most

5  favorable to [Plaintiffs], they violated no clearly established constitutional right." *Torres v. City of*

6  *Los Angeles*, 548 F.3d 1197, 1210 (9th Cir. 2008) (citing *Hunter v. Bryant*, 502 U.S. 224, (1991)).

7       A right is clearly established for purposes of qualified immunity only where "[t]he contours

8  of the right [are] sufficiently clear that a reasonable official would understand that what he is doing

9  violates that right." *Dunn v. Castro*, 621 F.3d 1196, 1200 (9th Cir. 2010) (quoting *Anderson v.*

10  *Creighton*, 483 U.S. 635, 640 (1987)). For a constitutional right to be clearly established, a court

11  must define the right at issue with "specificity" and "not . . . 'at a high level of generality.'" *City of*

12  *Escondido, Cal. v. Emmons*, 586 U.S. 38, 42 (2019). A clearly established right cannot merely be

13  implied by precedent, and plaintiffs may not defeat qualified immunity by describing violations of

14  clearly established general or abstract rights outside "an obvious case." *White v. Pauly*, 580 U.S. 73,

15  79, 80 (2017) (internal quotation marks and citations omitted). While the clearly established law

16  must be "particularized" to the facts of the case, *id.* at 79, a plaintiff need not point to circumstances

17  where "the very action in question has previously been held unlawful." *Anderson*, 483 U.S. at 640;

18  *see also Perez v. City of Fresno*, 98 F.4th 919, 924 (9th Cir. 2024) ("Although there need not be a

19  case directly on point, existing precedent must have placed the statutory or constitutional question

20  beyond debate.") (internal quotation marks and citations omitted). In fact, "officials can still be on

21  notice that their conduct violates clearly established law even in novel factual circumstances." *Hope*

22  *v. Pelzer*, 536 U.S. 730, 741 (2002). The plaintiff "bears the burden of showing that the rights

23  allegedly violated were clearly established." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1118

24  (9th Cir. 2017). Finally, "summary judgment in favor of moving defendants is inappropriate where a

25  genuine issue of material fact prevents a determination of qualified immunity until after trial on the

26  merits." *Est. of Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998, 1021 (9th Cir. 2017) (internal citations

27  omitted).

28

1  Here, Plaintiffs point to *Tenn. v. Garner*, 471 U.S. 1, 11 (1985), where the Supreme Court

2  held that deadly force is only justified when "the officer has probable cause to believe that the

3  suspect poses a threat of serious harm, either to the officers or to others." That case is factually

4  distinguishable as it involved a suspect who was shot by police while climbing a fence to evade his

5  capture. *Id.* at 3.

6  Although *Garner* is not directly on point, viewing the evidence in the light most favorable to

7  Plaintiffs, the Court finds that Plaintiffs have created genuine dispute of fact regarding qualified

8  immunity as it pertains to the novel factual circumstances that comprise Thomas Children's

9  Excessive Force claim. *Hope*, 536 U.S. at 741. *Garner* and other binding Ninth Circuit precedent

10  clearly establish that deadly force is appropriate only where the officer has probable cause to believe

11  that the suspect poses a threat of serious harm, either to the officers or to others. *Garner*, 471 U.S. at

12  11; *see also Henrich*, 39 F.3d at 914 ("An officer's use of deadly force is reasonable only if the

13  officer has probable cause to believe that the suspect poses a significant threat of death or serious

14  physical injury to the officer or others.") (internal quotation marks and citations omitted).

15  Regarding whether Defendant Deputies' conduct violated Thomas's constitutional rights, for

16  the reasons discussed in the previous section, the Court concludes that Plaintiffs' produce evidence

17  that, when viewed in the light most favorable to Plaintiffs, would allow a jury to find that Thomas's

18  constitutional rights were violated because the use of deadly force was not objectively reasonable

19  and thus violated Thomas's constitutional rights. More specifically, a jury may find that Thomas did

20  not pose a significant threat of death or serious physical injury to Defendant Deputies or to any third

21  party when he was fatally shot. For instance, Smith stated that Thomas was shot when both of his

22  hands were behind his back. ECF No. 170-50 ¶ 9. She also stated that at no time during the

23  encounter did Thomas reach for any of Defendant Deputies' service weapons. *Id.* In addition,

24  forensic analysis of Perales's service firearm revealed no DNA from Thomas on the weapon. SUF ¶

25  155; ECF No. 170-51 ¶ 17. And, as previously stated, Defendants' evidence is internally conflicting

26  with regard to the details of the fatal encounter, underscoring the existence of genuine issues of

27  material fact as to this claim. In particular, Shelton initially stated that he was standing in the

28  doorway during the shooting but then described having both hands on Thomas's arms just before

1  drawing his service weapon. SUF ¶¶ 197, 205.[14] Shelton also claimed that he observed Thomas grab

2  Perales's service firearm with his right hand, but later he acknowledged that he could not see

3  whether Perales's firearm holster was manipulated because Thomas's forearm was obstructing his

4  view, SUF ¶¶ 195, 196.

5  　　　　The Court finds that at the time of the shooting at issue, it was clearly established that law

6  enforcement may not kill even armed suspects "who do not pose an immediate threat to their safety

7  or the safety of others," including in some circumstances in which the suspect has "committed a

8  violent crime in the immediate past." *Harris v. Roderick*, 126 F.3d 1189, 1203–04 (9th Cir. 1997);

9  *see also Graham*, 490 U.S. at 394–397, *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir.

10  2014) ("An officer's use of deadly force is reasonable only if the officer has probable cause to

11  believe that the suspect poses a significant threat of death or serious bodily injury to the officer or

12  others.") (internal quotation marks and citations omitted); *Zion v. Cnty. of Orange*, 874 F.3d 1072,

13  1076 (9th Cir. 2017) ("If a jury determines that [plaintiff] no longer posed an immediate threat, any

14  deadly force [defendant officer] used after that time violated long-settled Forth Amendment law.").

15  And it was clearly established that "an unreasonable mistake in the use of deadly force against an

16  unarmed, nondangerous suspect violates the Fourth Amendment. *Torres v. City of Madera*, 648 F.3d

17  1119, 1129 (9th Cir. 2011).

18  　　　　Here, a jury must determine the facts relevant to qualified immunity: whether Deputy

19  Defendants could have reasonably believed that Thomas posed an immediate threat to their safety or

20  the safety such that Shelton's use of deadly force was objectively reasonable. Because Defendant

21  Deputies' entitlement to qualified immunity turns on the resolution of disputed issues of fact in their

22  favor, summary judgment is not appropriate. *See S.R. Nehad v. Browder*, 929 F.3d 1125, 1140 (9th

23  Cir. 2019) ("[W]hen there are disputed factual issues that are necessary to a qualified immunity

24  decision, these issues must first be determined by the jury before the court can rule on qualified

25  immunity.") (quoting *Morales v. Fry*, 873 F.3d 817, 824 (9th Cir. 2017)); *Wilkins v. City of Oakland*,

26  350 F.3d 949, 956 (9th Cir. 2003) ("Where officers' entitlement to qualified immunity depends on

27

28  _____

[14] The Court notes that Smith stated that Shelton was standing in the entryway at the time of the shooting. ECF No. 170-50 ¶ 9.

the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate.").

The Court will therefore DENY Defendants' Motion for Summary Judgment as to the Thomas Children's second Cause of Action for Excessive Force.

**E. The Defendants Are Entitled to Summary Judgment in their Favor as to the Smith's Claim for Unlawful Arrest Because There Is No Material Dispute of Fact as to This Claim (Second Cause of Action).**

Smith brings her own claims against the Defendant Deputies under Section 1983 for Unlawful Arrest and Excessive Force based upon their actions towards her.[15] *See* 2AC ¶¶ 54–62; 63–69. Defendants argue that both of these claims must be dismissed under the doctrine of qualified immunity. *See* Mot. at 49–50.

In her Unlawful Arrest claim, Smith alleges that Defendant Deputies acted unlawfully when they conducted a warrantless entry into her home and grabbed her by her arms and moved her away from Thomas without a warning or probable cause to believe a crime occurred. *See* 2AC ¶¶ 55–58. She alleges that Defendant Deputies' conduct deprived her of her Fourth Amendment rights against unreasonable seizures. *Id.* ¶ 57, 58.

Defendants seek qualified immunity with regard to Smith's Unlawful Arrest claim. They argue that qualified immunity is appropriate because Smith was never seized for any crime without probable cause or reasonable suspicion. Mot. at 49. Defendants contend that Defendant Deputies verbally ordered her to stay away from the struggle with Thomas and moved her away from the incident scene. *Id.* In addition, Defendants assert that no reasonable officer would have been on notice that their conduct towards Smith during Defendant Deputies' struggle to gain Thomas's compliance and immediately following the shooting was unlawful. *Id.* at 49–50.

"A claim for unlawful arrest is cognizable under Section 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification." *Dubner v. City & Cnty. of San Francisco*, 266 F.3d 959, 964 (9th Cir. 2001). "Probable cause exists when, under the

---

[15] These claims are distinct from the claims that the Thomas Children bring against the Defendant Deputies on their father's behalf.

totality of the circumstances known to the arresting officers, a prudent person would believe the suspect had committed a crime." *Fortson v. Los Angeles City Attorney's Off.*, 852 F.3d 1190, 1194 (9th Cir. 2017) (citation modified). An arrest occurs when a law enforcement officer, through coercion, physical force, or a show of authority, in some way restricts the liberty of a person. *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004) (internal quotation marks and citations omitted). An individual's liberty is restrained when, "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Id.*

Smith testified that upon entering the residence, two of the Defendant Deputies approached her, told her to take a step back and stood on either side of her. ECF No. 170-50 ¶ 8. However, the Unlawful Arrest claim alleges that Defendant Deputies grabbed her by her arms and forcibly moved her away from Thomas. 2AC ¶ 56. Smith produces no evidence to support the allegation that Defendant Deputies used any physical force to subdue her when they initially entered the residence. And the allegation appears to be refuted by her own statement regarding her initial interaction with Defendant Deputies when they entered the residence. *See* ECF No. 170-50 ¶ 8. Moreover, Plaintiffs' arguments as to this claim do not suggest that Defendant Deputies grabbed Smith by her arms and forcibly moved her at any point during the encounter. *See* Mot 50–53. In addition, Smith points to no authority that indicates Defendant Deputies' verbal commands to stay away from Defendant Deputies' interactions with Thomas violated a clearly established constitutional right.

For these reasons, the Court finds there is no genuine dispute of material fact as to the Smith's second Cause of Action for Unlawful Arrest. Accordingly, the Court GRANTS the Motion as to this claim, and it is therefore DISMISSED.

### F. A Material Dispute of Fact Prevents Summary Judgment On the Ground of Qualified Immunity With Respect to Smith's Excessive Force Claim as it Relates to Shelton (Third Cause of Action).

In her Excessive Force claim, Smith alleges that Defendant Deputies employed excessive force against her when Shelton pointed his service firearm at her face without legal justification. *Id.*

1    ¶ 65. Smith alleges that this act deprived her of her Fourth Amendment right against unreasonable

2    seizures. *Id.* The Court will evaluate each claim in turn.

3          Defendants argue that they are entitled to qualified immunity as to Smith's Excessive Force

4    claim because any force used to control her movement was *de minimis* and because Defendant

5    Deputies were ultimately trying to protect both her and the crime scene. *See* Mot. at 49–50; 53–54.

6    Defendants further argue that any force used by Defendant Deputies in restraining Smith was not a

7    level of force that would likely produce serious injury. *Id.* Lastly, Defendants contend that

8    Defendant Deputies are entitled to qualified immunity as to this claim because Smith's constitutional

9    rights were never violated, and there was no clearly established right during the relevant time. *Id.*

10         The Court finds that the alleged excessive force in this claim is not *de minimis* and may result

11   in serious injury. *Robinson,* 278 F.3d at 1015 ("[A]s a general principle … pointing a gun to the head

12   of an apparently unarmed suspect during an investigation can be a violation of the Fourth

13   Amendment, especially where the individual poses no particular danger.").

14         With regard to whether Defendant Deputies violated Smith's clearly established Fourth

15   Amendment right against unreasonable seizures, Smith points to two cases, *Robinson v. Solano*

16   *County* and *Hopkins v. Bonvicino*, to support her argument. *Id.* at 49.

17         In *Robinson*, a suspect peacefully approached police officers on a public street and informed

18   the officers that he was a suspect of a misdemeanor that occurred earlier in the day. 278 F.3d at

19   1010. One of the officers reacted by immediately drawing his service weapon and pointing it at the

20   suspect's head. *Id.* The court held that "pointing a gun to the head of an … unarmed suspect during

21   an investigation can be a violation of the Fourth Amendment, especially where the individual poses

22   no particular danger." *Id.* at 1016.

23         *Hopkins* involved the warrantless entry into the home of the plaintiff who was reported to

24   have engaged in a hit-and-run accident. 573 F.3d at 761. The officers entered the home guns drawn,

25   ordered the plaintiff to show his hands, told him that he was under arrest, and handcuffed him. *Id.* at

26   773. The Court held that the officers' training of their guns at the unarmed plaintiff, even after he

27   was handcuffed and posed no threat to their safety, constituted excessive force under the Fourth

28   Amendment. *Id.* at 776–77.

Both of these cases are factually distinct from Smith's allegations such that they cannot clearly establish Smith's Fourth Amendment right against unreasonable seizures on their own. The Court nevertheless finds that there is a triable issue of fact regarding qualified immunity here.

As the Supreme Court held in *Hope*, "officials can still be on notice that their conduct violates clearly established law even in *novel factual circumstances*." 536 U.S. at 741 (emphasis added). Although the cases that Smith relies on are not directly on point, and this matter involves "novel factual circumstances," the Court finds that those precedents clearly establish that it is a constitutional violation for an officer to point a weapon at a person who is compliant and who presents no danger. *Robinson,* 278 F.3d at 1015 ("[P]ointing a gun to the head of an apparently unarmed suspect during an investigation can be a violation of the Fourth Amendment, especially where the individual poses no particular danger."); *Thompson v. Rahr*, 885 F.3d 582, 587 (9th Cir. 2018) ("[P]ointing guns at persons who are compliant and present no danger is a constitutional violation.") (internal quotation marks and citations omitted).

Taking the facts in a light most favorable to Plaintiffs, Smith's testimony establishes a genuine dispute of fact as to whether Smith was subjected to unreasonable force by Shelton in violation of her clearly established Fourth Amendment rights.[16] For these reasons, the Motion, insofar as it seeks qualified immunity with respect to Smith's third Cause of Action for Excessive Force, is DENIED.

## G. There is a Material Dispute of Fact as to the Thomas Children's Claim for Denial of Medical Care (Third Cause of Action).

The Thomas Children's 5AC bring a claim against Defendant Deputies for Denial of Medical Care under Section 1983. *See* 5AC ¶¶ 44–50.

Claims for denial of medical care during and immediately following an arrest are analyzed under the Fourth Amendment and its "objective reasonableness" standard. *Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1098–99 (9th Cir. 2006). Claims for denial of medical care for

---

[16] During the During the August 21, 2025 hearing on the Motion Plaintiffs' Counsel and Defendants' Counsel stipulated that Perales, Herrera, Murphy, and Gonzalez did not use force against Smith during the encounter and are therefore not the subject of this claim.

individuals injured in police custody are analyzed under the Fourteenth Amendment. *Maddox v. City of Los Angeles*, 792 F.2d 1408, 1414–15 (9th Cir. 1986). The 5AC does not allege which amendment governs the Thomas Children's Denial of Medical Care claim. 5AC ¶¶ 44–50. In the Motion, the parties refer to both the Fourth and Fourteenth Amendments as well as the Eighth Amendment standard for "deliberate indifference to serious medical needs," which is applicable to individuals who are incarcerated. Mot. at 54–56. The Court finds that claims for denial of medical care during and immediately following an arrest are analyzed under the Fourth Amendment and its objective reasonableness standard, and will thus apply that standard to the facts and evidence produced here. *Tatum*, 441 F.3d 1098–99; *Hernandez v. Dickey*, No. LA17CV03447VAPRAOX, 2018 WL 5906031, at *10 (C.D. Cal. May 10, 2018) (finding that the Fourth and not the Fourteenth Amendment is violated by a denial of medical care during and immediately following arrest).

The Fourth Amendment requires law enforcement to provide objectively reasonable post-arrest care to an apprehended suspect. *Tatum*, 441 F.3d at 1099. While the Ninth Circuit has not specified the exact contours of objectively reasonable post-arrest care to a suspect, they have held that an arresting officer fulfills his Fourth Amendment obligations by either "promptly summoning the necessary medical help or taking the injured detainee to a hospital." *Id.* (internal citations omitted). "Just as the Fourth Amendment does not require a police officer to use the least intrusive method of arrest, [] neither does it require an officer to provide what hindsight reveals to be the most effective medical care for an arrested suspect." *Id.* at 1098 (internal citations omitted). "Courts in the Ninth Circuit have often held that the reasonableness inquiry under the Fourth Amendment is ordinarily a question of fact for the jury." *Henriquez v. City of Bell*, No. CV 14-196-GW(SSX), 2015 WL 13357606, at *7 (C.D. Cal. Apr. 16, 2015).

Here, Defendants argue that this claim fails because it is undisputed that Defendant Deputies met their constitutional obligations by immediately summoning medical assistance to the scene of the incident and immediately providing cardiopulmonary resuscitation ("CPR") to Thomas until emergency medical service professionals arrived on scene. *See* Mot. at 54–55, 59–60. Plaintiffs counter that Defendant Deputies failed to make the necessary call to summon paramedics—a

1    "902R" call. *Id.* at 56–57. Plaintiff's also assert that, contrary to Defendants claims, Defendant

2    Deputies failed to provide life-saving measures *immediately* following the shooting. *Id.* at 57–58.

3        Defendants produce evidence that Defendant Deputies made a "902R" call following the

4    shooting, appropriately summoning paramedics to the scene to assist Thomas. *See* ECF No. 170-7,

5    Ex. 93. However, the Court finds that the Thomas Children have produced evidence that creates a

6    genuine dispute of a material fact as to whether Defendant Deputies *promptly* rendered life-saving

7    measures following the shooting, before paramedics arrived. Defendants represent that Gonzalez

8    immediately administered aid, including chest compressions, to Thomas after he was shot. SUF ¶ 48.

9    And Defendants point to Perales's body worn camera footage, which shows a Sheriff's Deputy

10   performing CPR on Thomas. Mot. at 59; ECF No. 170-7, Ex. 41. However, Defendants also

11   represent that immediately after the shooting, all Defendant Deputies stepped outside to verify that

12   no one was injured. SUF ¶ 46. In addition, Smith stated that when Defendant Deputies escorted her

13   out of the residence approximately five minutes after the shooting, she did not see anyone providing

14   CPR to Thomas. ECF No. 170-50 ¶ 11. Smith testified that at the time, Thomas was still alive and

15   held eye contact with Smith as she was being escorted out of the residence. *Id.* Plaintiffs also point to

16   the Major Incident Log and Supplemental Reports of Deputy Sheriffs Robert Orta and Justin San

17   Juan, which state that both Deputy Sheriffs began performing CPR on Thomas upon their arrival at

18   the residence. ECF Nos. 170-28, 170-29. There is no indication in those records, however, that

19   Defendant Deputies were already performing CPR on Thomas when they arrived on scene. ECF

20   Nos. 170-28, 170-29. While the body worn camera footage shows a Sheriff's Deputy performing

21   CPR on Thomas, it is unclear from the body worn camera footage how much time transpired

22   between the shooting and the implementation of those measures. Taking the facts in a light most

23   favorable to Plaintiffs, a jury could find that Defendant Deputies failed to promptly administer

24   emergency medical assistance to Thomas in violation of governing LASD policy, ECF No. 170-42

25   Ex. 63, and in violation Thomas's Fourth Amendment rights.

26        For these reasons, the Motion is DENIED as to the Thomas Children's third Cause of Action

27   for Denial of Medical Care.

28

### H. No Material Dispute of Fact Exists as to the Thomas Children's Interference with Familial Relationship and Freedom of Association Claim (Fourth Cause of Action).

In their complaint, the Thomas Children bring a substantive due process claim against Defendant Deputies for Interference with Familial Relationship and Freedom of Association. *See* 5AC ¶¶ 51–59. As children of the deceased individual, they bring these claims on their own behalf, asserting that the Defendant Deputies interfered with their rights to a familial relationship with their father and their rights to freedom of association with their father. *Id.*

Defendants argue that this claim fails because the Thomas Children produce no evidence that shows Defendant Deputies acted with purpose to harm such that their conduct "shocks the conscience," or that Defendant Deputies actions were unrelated to any legitimate law enforcement objective. Mot. at 61–62. Defendants also assert that they are shielded from this claim under the doctrine of qualified immunity. *Id.*

Family members may assert a "Fourteenth Amendment claim based on the related deprivation of their liberty interest arising out of their relationship with" a decedent. *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 (9th Cir. 1998). "This substantive due process claim may be asserted by both parents and children of a person killed by law enforcement officers." *Id.* A claim for deprivation of a familial relationship requires a showing of "[o]fficial conduct that 'shocks the conscience.'" *Wilkinson v. Torres*, 610 F.3d 546, 544 (9th Cir. 2010). The first step in determining whether conduct shocks the conscience is to consider "whether the circumstances are such that actual deliberation [by that officer] is practical." *Id.* (alteration in original). Where actual deliberation is "practical," then the official conduct "may suffice to shock the conscience." *Id.* But where an officer "makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id.* (labeling this standard the "purpose-to-harm" standard); *Peck v. Montoya*, 51 F.4th 877, 893 (9th Cir. 2022) ("[I]f the defendants had to make a snap judgment because of an escalating situation, then their conduct does not shock the conscience unless they acted with a purpose to harm unrelated to legitimate law enforcement objectives. [Courts] apply the

1  purpose-to-harm standard when officials were required to make repeated split-second decisions

2  about how to best respond to a risk ….") (internal quotations marks and citations omitted).

3        The Court finds that the application of the purpose-to-harm standard to the Thomas

4  Children's Interference with Familial Relationship and Freedom of Association claim is appropriate.

5  There is no dispute that the encounter between Defendant Deputies and Thomas quickly escalated as

6  less than three minutes passed between Defendant Deputies entering the residence and the fatal

7  shooting. Mot. at 15; *see Porter v. Osborn*, 546 F.3d 1131, 1139–40 (9th Cir. 2008) (finding

8  deliberation was not practical where a five-minute altercation between the officers and victim

9  evolved quickly and forced the officers to make "repeated split-second decisions," and noting that

10  the purpose-to-harm standard applies where a suspect's evasive actions force the officers to act

11  quickly).

12        The Court finds that Plaintiffs have failed to establish a genuine dispute as to whether

13  Defendant Deputies' acted with a purpose to harm. Plaintiffs point to the fact that Defendant

14  Deputies forced entry into the residence without a warrant, and claim this conduct needlessly

15  escalated the encounter that culminated in Thomas's death. Mot. 63–66. But this evidence does not

16  show that the encounter was motivated by an ulterior purpose to harm Thomas unrelated from

17  legitimate law enforcement objectives. *See Wilkinson*, 610 F.3d at 554.

18        Plaintiffs also argue that Defendant Deputies made flawed tactical choices, especially early

19  in the encounter, thereby creating a lethal environment. But the purpose-to-harm standard may apply

20  where "the officer may have helped to create an emergency situation by his own excessive actions."

21  *Porter*, 546 F.3d at 1132; *see also Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013)

22  (applying the purpose-to-harm standard to a lethal shooting even though the officers "could have

23  potentially avoided the incident by obtaining more information about [Thomas] or requesting a

24  psychiatric emergency response team … before entering the house"). Under the governing purpose-

25  to-harm standard, the substantive due process claim still fails because no showing of a purpose to

26  harm Thomas has been made. *Porter*, 546 F.3d at 1142 (explaining that an unlawful purpose to harm

27  exists where officers' actions can be reasonably construed as "punishing or harassing"). More

28

specifically, no evidence suggest that Defendant Deputies shot Thomas for any other purpose than a perception of a need for self-defense.

For these reasons, the Court GRANTS the Motion as to the Thomas Children's fourth Cause of Action for Interference with Familial Relationship and Freedom of Association. Accordingly, the claim is DISMISSED.

### I. No Material Dispute of Fact Exists as to the Thomas Children's and Smith's *Monell* Claims (42 U.S.C. § 1983).

Defendants also seek summary judgment on Plaintiffs' claims against County Defendant for Custom, Practice or Policy Causing Violation of Civil Rights under Section 1983 ("*Monell* claim"). *See* 2AC ¶¶ 70–94; 5AC ¶¶ 60–81.

A municipality may be held liable under Section 1983 only where an "action pursuant to official municipal policy of some nature causes a constitutional tort." *Monell v. Dep't. of Soc. Serv's of City of New York.*, 436 U.S. 658, 691 (1978); *see also Gordon v. Cnty. of Orange*, 6 F.4th 961, 973–74 (9th Cir. 2021) (*Gordon II*) (explaining the elements of *Monell* liability, one of which is that a *municipality* had a policy). To impose liability on the County Defendant under Section 1983, Plaintiffs must prove: (1) Thomas and Smith possessed a constitutional right that was violated; (2) the County Defendant had a policy; (3) the policy amounts to deliberate indifference to the constitutional right; and (4) the policy is the moving force behind the constitutional violation. *See Gordon II*, 6 F.4th at 973 (citation omitted).

A plaintiff can establish that such a policy or custom occurred by showing "(1) an official policy, (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019).

Both the Thomas Children and Smith allege *Monell* liability based on a variety of factual theories. *See* 2AC ¶¶ 70–94; 5AC ¶¶ 60–81. In their Opposition to the Motion, Plaintiffs clarify that they are alleging: (1) the moving force behind the unconstitutional use of deadly force against Thomas and Smith was County Defendant's persistent failure to implement court-mandated policing reforms regarding use of force policy, Sheriff's Deputy training, and bias-based policing at the Los

Angeles Sheriff's Department's Antelope Valley stations, and (2) COLA ratified Defendant Deputies' conduct during the incident. Mot. at 74–80.

>    1.   *The Motion is GRANTED as to the Monell Claims Insofar as Those Claims are Based on County Defendant's Failure to Implement Court-Mandated Policing Reforms.*

Plaintiffs argue that vital policing policy reforms concerning, among other issues, departmental policy and Sheriff's Deputy training requirements regarding use of force, tactical planning, and de-escalation, that were mandated pursuant to a 2015 settlement agreement between LASD and the Department of Justice ("DOJ") were not instituted by County Defendant at the time of the shooting of Thomas. Mot at 74–77. Plaintiffs urge that County Defendant's failure to implement these court-mandated reforms, and their awareness of their policy and training deficiencies, indicate deliberate indifference on the part of County Defendant that gives rise to a "pattern of general disregard for the Fourth Amendment that is sufficiently relevant to the claims at issue here to establish a triable issue." *Id.*

Defendants produce evidence that indicates that LASD Sheriff's Deputies are required to follow policies and directives concerning domestic violence incidents, warrantless entries under exigent circumstances, use of force, and use of force prevention tactics. SUF ¶¶ 65–79. With regard to the LASD use of force policy, Defendants produce additional evidence that the use of force policy is consonant with the Supreme Court's dictates in *Graham v. Conner. Id.* ¶ 69; ECF No. 170-36, Ex. 57, ECF No. 170-37, Ex. 58. In particular, LASD's use of force policy establishes that deadly force may be used only when a suspect poses an imminent threat of death or serious bodily harm to the officers or a third party. ECF No. 170-48, Ex. 69. And Defendants produce evidence that Defendant Deputies were trained on LASD's use of force policies. ECF No. 170-27 at 41:17–25, 42:1–13, ECF Nos. 170-21, Ex. 42, 170-22, Ex. 43, 170-23, Ex. 44, 170-23, Ex. 45. The Court acknowledges the importance of the full implementation of the court-mandated policy and training reforms set forth in the 2015 settlement agreement to enhance LASD's ability to serve its constituents. However, while Plaintiffs' rely on the 2015 settlement agreement to justify their respective *Monell* claims, the findings articulated in the settlement agreement do not conclude that LASD's use of force policy was unconstitutional or out of harmony with binding authority concerning law enforcement use of

deadly force under the Fourth Amendment during the relevant time period. *See* ECF No. 170-75 ¶¶ 102–123. Moreover, there are no factual allegations concerning the DOJ reforms from which the Court can infer the 2015 settlement agreement reforms would have prevented the alleged Fourth Amendment violations at issue.

With respect to Plaintiffs failure-to-train claim, those allegations are not grounded in any training modules that County Defendant provides to its Sheriff's Deputies, including Defendant Deputies. Specifically, Plaintiffs failed to identify any inadequacy in the training the County Defendant provides to its Sheriff's Deputies, and thus Plaintiffs have not shown deliberate indifference. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) ("[I]t is … difficult in on sense even to accept the submission that someone pursues a 'policy' of 'inadequate training' unless evidence be adduced which proves that the inadequacies resulted from conscious choice—that is, proof that the policymakers deliberately chose a training program which would prove inadequate."); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989) ("We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contract."). Moreover, as previously explained, Defendants produce evidence that the County had applicable use of force policies and that Defendant Deputies were trained in these policies.

For these reasons, the Motion is GRANTED as to the Thomas Children's fifth Cause of Action for *Monell* liability and Smith's fourth Cause of Action for *Monell* liability insofar as they are based on the theories of unconstitutional policies and County Defendant's failure to adequately train its officers.

### 2. *The Motion Is GRANTED as to the Monell Claims Insofar as Those Claims Are Based on Ratification.*

Plaintiffs contend County Defendant is subject to *Monell* liability under the ratification theory because the County Defendant's Executive Force Review Committee's ("EFRC")[17] review of

---

[17] The EFRC reviews use of force incidents that automatically trigger a response from the LASD Internal Affairs Bureau ("IAB") Force/Shooting Response Team (i.e., Category 3 Force incidents) for any policy, training, or tactical concerns and/or violations. ECF No. 170-41; ECF No. 170-62 at 27–30; ECF No. 170-75 ¶ 114.

1  the LASD's Internal Affairs Bureau's investigation of the use of force against Thomas was either a

2  sham or involved underlying conduct so outrageous that a reasonable administrator should have

3  imposed disciplinary action. Mot at 77–80.

4      "To show ratification, a plaintiff must prove that the 'authorized policymakers approve a

5  subordinate's decision and the basis for it.'" *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999)

6  (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). Ratification requires more than

7  acquiescence. *Sheehan v. City & Cnty. of S.F.*, 743 F.3d 1211, 1231 (9th Cir. 2014), *rev'd on other*

8  *grounds*, 135 S. Ct. 1765 (2015). Instead, a plaintiff must show that the triggering decision was the

9  product of a "deliberate choice from among various alternatives" to ratify the conduct in question.

10 *Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir. 1992) (internal quotation marks and citations

11 omitted). Moreover "ratification requires both knowledge of the alleged constitutional violation, and

12 proof that the policymaker specifically approved of the subordinate's act." *Lytle v. Carl*, 382 F.3d

13 978, 987 n.2 (9th Cir. 2004); *see also Lassiter v. City of Bremerton*, 556 F.3d 1049, 1055 (9th Cir.

14 2009) ("A single decision by a municipal policymaker may be sufficient to trigger Section 1983

15 liability under *Monell*, even though the decision is not intended to govern future situations, but the

16 plaintiff must show that the triggering decision was the product of a conscious, affirmative choice to

17 ratify the conduct in question.") (internal quotation marks and citations omitted). Relevant to

18 Plaintiffs' arguments, an investigation into an officer's conduct that concludes without discipline

19 does not constitute ratification without proof of "something more[,] such as a "sham investigation"

20 or "conduct [by the officer] so outrageous that a reasonable administrator should have known that he

21 or she should do something about it." *Kanae v. Hodson*, 294 F. Supp. 2d 1179, 1190–91 (D. Haw.

22 2003); *see Larez v. City of L.A.*, 946 F.2d 630, 647 (9th Cir. 1991) (finding that the result of the

23 internal police investigation approving officer's use of force could constitute ratification if the

24 investigation was based on "flawed procedures" under which, "at least in the absence of

25 independent, third-party witnesses, [officers] could get away with anything"); *see also Watkins v.*

26 *City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998) (noting that *Larez* was based on a set of facts

27 where a jury could find that the "police chief was responsible for the constitutional deprivations

28

1  because he condoned, ratified, and encouraged the excessive use of force") (internal quotation marks

2  omitted).

3  To support their arguments, Plaintiffs point to IAB's failure to investigate discrepancies

4  between Shelton's IAB statement concerning the incident and the 911 call recording, the forensic

5  investigation of Perales's service firearm, and the failure of Deputy Pyon to provide Smith with

6  accommodations during her investigative interview following the shooting in light of Smith's

7  hearing impairments. Mot at 77–80. Plaintiffs assert that the EFRC's finding that Shelton's conduct

8  did not violate any LASD policies or procedures in the context of these investigative deficiencies

9  promotes an inference that the Committee knew the conduct was constitutionally violative but chose

10  not to report it as such in order to evade scrutiny following the 2015 settlement agreement. *Id.*

11  Such investigative shortcomings are not sufficient to raise an issue of fact as to whether

12  County Defendant's investigatory procedures were so flawed as to make it "almost impossible for a

13  [Sheriff's Deputy] to suffer discipline." *Larez*, 946 F.2d at 647. Indeed, the EFRC report

14  reprimanded Defendant Shelton for his conduct during the incident and suspended him from service.

15  ECF No. 170-57 at 6.

16  For these reasons, the Court grants the Motion as to the Thomas Children's fifth Cause of

17  Action for *Monell* liability and Smith's fourth Cause of Action for *Monell* liability insofar as they are

18  based on the ratification theory. Accordingly, the Thomas Children's fifth claim and Smith's fourth

19  claim are DISMISSED.

20  **J. A Material Dispute of Fact Exists as to the Thomas Children's California Civil Code**
21  **Section 52.1 (Bane Act) Claim (Eighth Cause of Action).**

22  The Thomas Children allege a claim against Defendants under the Tom Bane Act. *See* 5AC

23  ¶¶ 101–108. Defendants seek summary judgment on this claim on ground that there is no evidence

24  of interference or attempt to interfere by threat, intimidation, or coercion with Thomas's

25  constitutional rights. Mot. at 89–90.

26  "The Legislature enacted Civil Code the Tom Bane Act to stem a tide of hate crimes." *Austin*

27  *B. v. Escondido Union Sch. Dist*, 149 Cal. App. 4th 860, 882 (2007) (internal quotation marks and

28  citations omitted). The Act requires an attempted or completed act of interference with a legal right,

accompanied by a form of coercion. *Id.* The Act permits a claim against "a person or persons, whether or not acting under color of law, [who] interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of [California]." Cal. Civ. Code § 52.1(a)–(c). "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." *Austin B.*, 149 Cal. App. 4th at 883. "[T]he Tom Bane Act does not require the 'threat, intimidation or coercion' element of the claim to be transactionally independent from the constitutional violation alleged." *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018) (citation omitted). But it does require "a showing of the defendant's specific intent to violate the plaintiff's constitutional rights." <u>Rodriguez v. Cnty. of Los Angeles</u>, 891 F.3d 776, 802 (9th Cir. 2018) (citing *Reese*, 888 F.3d at 1043). Specific intent for the purposes of a Bane Act claim can be established with evidence of a defendant's reckless disregard for a person's constitutional rights. *Reese*, 888 F.3d at 1045; *see also Cornell v. City & Cnty. of San Francisco*, 17 Cal. App. 5th 766, 803–04 (2017) ("[S]pecific intent" may be shown by demonstrating that the defendant "acted … 'in reckless disregard of constitutional or statutory prohibitions or guarantees.'"). Lastly, in California, "every person has … the [statutory] right of protection from bodily restraint or harm[.]" Cal. Civ. Code § 43. "[T]he phrase 'right of protection from bodily restraint or harm' refers simply to an individual's right to be free from physical attack or threat thereof." *People v. Lashley*, 1 Cal. App. 4th 938, 951 (1991).

The Court finds that Plaintiffs have produced enough evidence—when viewed with all permissible inferences in their favor—to create a triable issue about whether Defendant Deputies acted with "reckless disregard" of Thomas's Fourth Amendment right against unreasonable seizures, his Fourth Amendment right to post-arrest medical care, and his statutory right of protection from bodily restraint or harm. As detailed extensively above, Plaintiffs produce evidence that gives rise to a genuine issue for trial regarding whether Thomas was subdued with his hands behind his back

when he was fatally shot and as to whether Defendant Deputies promptly administered life saving measures to Thomas after he was shot. A jury may that Defendant Deputies' conduct demonstrates that they acted with "reckless disregard" for Thomas's constitutional and statutory rights. Such factual issues are properly reserved for the trier of fact. *See Hughes v. Rodriguez*, 31 F.4th 1211, 1224 (9th Cir. 2022) ("Whether [officer] used excessive force in violation of [plaintiff's] constitutional right, and whether he had a specific intent to do so, are questions properly reserved for the trier of fact.").

For these reasons, the Motion is DENIED as to the Thomas Children's eighth Cause of Action for Violation of the Tom Bane.

## VI.    **Plaintiffs' Motion for Sanctions**

Plaintiffs move for monetary sanctions against County Defendant and a terminating sanction, alleging that County Defendant willfully misrepresented to the Court and to Plaintiffs the nature of Defendant Shelton's proceedings before the COLA Civil Service Commission ("CSC") and whether or not he filed an appeal challenging a disciplinary measure imposed on him in 2023. *See generally* ECF No. 163. In doing so, Plaintiffs assert that County Defendant attempted to strategically obstruct Plaintiffs from discovering that County Defendant determined in their EFRC conclusions that Defendant Shelton's conduct escalated the fatal encounter with Thomas. *Id.* Plaintiffs assert that County Defendant's deception prejudiced their ability to develop their case and delayed litigation. *Id.*

Under Federal Rule of Civil Procedure 37, a district court, in its discretion, may impose a wide range of sanctions when a party fails to comply with the rules of discovery or with a court order enforcing those rules. *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 589 (9th Cir. 1983). Sanctions include striking pleads, dismissing an action, or rendering a default judgment against the disobedient party. *See* Fed. R. Civ. P. 37(b)(2). Where a sanction is case dispositive, that is, a "terminating sanction," a district court applies a five-part test to determine whether the sanction is just. *See Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007). The five guiding factors are: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4)

1  the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic

2  sanctions." *Id.* (internal quotation marks omitted).

3        The Court finds that the five factors weigh against Plaintiffs' Motion for Sanctions as

4  Plaintiffs fail to show that County Defendant intentionally mislead Plaintiffs or the Court or acted in

5  bad faith.

6        The first two factors, the public interest in expeditious resolution of litigation and the Court's

7  interest in managing its docket, weigh against granting sanctions. Plaintiffs make conclusory

8  assertions that COLA's conduct constitutes a willful and deliberate misrepresentation. ECF No. 147-

9  1 at 21. In essence, Plaintiffs blame any delay in expeditious resolution of this case and impediment

10  to the Court's ability to manage its docket on Defendants' misrepresentations concerning production

11  of the EFRC findings regarding Shelton's conduct. ECF No. 152 at 5–7. But Plaintiffs produce no

12  evidence that indicates that there was willful, bad faith conduct on the part of Defendants. On the

13  other hand, Defendants produce a declaration in support of their opposition that provides a plausible

14  explanation for their withholding of the EFRC records during the pendency of Shelton's appeal of

15  the EFRC's findings to the COLA Employees Relation Commission. ECF No. 150-1 ¶¶ 2–16.

16  Moreover, the record indicates that Defendants were not unresponsive to Plaintiffs' requests for this

17  information, even if mistaken. *Id.* Any delay in the efficient and just resolution of this action cannot

18  be solely attributed to the conduct of County Defendant. The Court also notes that the vast majority

19  of the modifications to the Court's Scheduling Order were the result of joint stipulations filed on

20  behalf of both parties, not due to any single party's unresponsiveness. *See* ECF Nos. 118, 122, 174.

21        The third factor, the risk of prejudice to the party seeking sanctions, weighs against granting

22  a terminating sanction. "In determining whether [the moving party] has been prejudiced, we examine

23  whether the [non-moving party's] actions impair the [moving party's] ability to go to trial or threaten

24  to interfere with the rightful decision of the case." *Malone v. U.S. Postal Serv.*, 833 F.2d 128, 131

25  (9th Cir. 1987). Plaintiffs' Motion for Sanctions asserts that County Defendant's conduct

26  jeopardized Plaintiffs' ability corroborate that Shelton's pre-shooting conduct was negligent. *See*

27  ECF No. 163 at 4. However, Defendants have generally complied with Plaintiffs' discovery requests

28  and have executed the Magistrate Judge's discovery orders such that Plaintiffs had the evidence

necessary to support their claims. ECF No. ¶¶ 19, 23–24. As such, the Court finds that Defendants' conduct did not frustrate Plaintiffs' efforts develop their case, interfere with the outcome of this case or impede this case's progress towards trial.

The fourth factor recognizes the strong public policy that a case be decided on the merits. This factor weighs against granting the Plaintiffs' Motion for Sanctions as granting it would prevent the action from being decided on the merits.

The fifth factor, the availability of less drastic sanctions, has the following three sub-parts: (a) "whether the court has considered lesser sanctions;" (b) "whether it tried them;" and (c) "whether it warned the recalcitrant party about the possibility of case-dispositive sanctions." *Conn. Gen. Life Ins. Co.*, 482 F.3d at 1096.

Here, Plaintiffs have not previously requested—nor has the Court imposed—any lesser sanctions or warning against Defendants for any willful misconduct or intentional bad faith tactics in its dealings with Plaintiffs throughout the course of litigation or in its representations to this Court. And in their Motion for Sanctions, Plaintiffs do not propose any lesser sanction, instead seeking only the most sever sanction of termination of the entire action. *See* ECF No. 152 at 8–9. The Court finds, however, that a terminating sanction and a less drastic sanction is unwarranted here because the record does not indicate that Defendants engaged in any purposeful or frivolous conduct throughout discovery or during other phases of litigation of this action.

For these reasons, the Court finds that five factors weigh in against of granting Plaintiffs' Motion for Sanctions. Accordingly, the Motion for Sanctions is DENIED.

## VII.    Conclusion

For the foregoing reasons, the Court hereby GRANTS IN PART Plaintiffs' Joint Request for Judicial Notice, GRANTS IN PART the Motion, DENIES the Motion for Sanctions, and ORDERS as follows:

a.  The RJN is GRANTED as to ECF Nos. 170-54–170-57 and DENIED as to ECF Nos 170-53, 170-59, 170-60.

b.  The Motion is GRANTED as to the Thomas Children's first Cause of Action for Unlawful Entry against Defendant Deputies.

c.   The Motion is DENIED as to the Thomas Children's second Cause of Action for Excessive Force against Defendant Deputies.

d.   The Motion is DENIED as to the Thomas Children's third Cause of Action for Failure to Provide Medical Care against Defendant Deputies.

e.   The Motion is GRANTED as to the Thomas Children's fourth Cause of Action for Interference with Familial Relationship and Freedom of Association against Defendant Deputies.

f.   The Motion is GRANTED as to the Thomas Children's Fifth Cause of Action for Custom, Practice or Policy Causing Violation of Civil Rights against County Defendant.

g.   The Motion is DENIED as to the Thomas Children's sixth Cause of Action for Battery against all Defendants.

h.   The Motion is DENIED as to the Thomas Children's seventh Cause of Action for Negligence against all Defendants.

i.   The Motion is DENIED as to the Thomas Children's eighth Cause of Action for Violation of the Tom Bane Act.

j.   The Motion is GRANTED as to Smith's first Cause of Action for Unlawful Entry against Defendant Deputies.

k.   The Motion is GRANTED as to Smith's second Cause of Action for Unlawful Arrest against Defendant Deputies.

l.   The Motion is DENIED as to Smith's third Cause of Action for Excessive Force against Deputy Shelton; it is GRANTED as to Smith's third Cause of Action for Excessive Force against Deputies Perales, Herrera, Murphy, and Gonzalez.

m.   The Motion is GRANTED as to Smith's fourth Cause of Action for Custom, Practice or Policy Causing Violation of Civil Rights against County Defendant.

n.   The Motion for Sanctions is DENIED.

IT IS SO ORDERED.

1

2    Dated: September 12, 2025

3

4                                        MAAME EWUSI-MENSAH FRIMPONG

5                                            United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28